**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>SANDRA J. DE FORREST,<br>Defendant. | ) | Case No.: 2:17-cv-03048-GMN-DJA<br>**ORDER** |

Pending before the Court is the Government's Motion for Partial Summary Judgment, (ECF No. 26). Defendant Sandra J. de Forrest ("Defendant") filed a Response, (ECF No. 34), and the Government filed a Reply, (ECF No. 40).[1] For the reasons stated herein, the Government's Motion is denied.

## I. **BACKGROUND**

The Government brings this action to collect from Defendant outstanding civil penalties for Defendant's alleged willful failure to timely file a Report of Foreign Bank and Financial Accounts, Form TDF 90-22.1, commonly referred to as an "FBAR," in violation of 31 C.F.R. § 1010.350(a) and 31 U.S.C. § 5314(a). The following is a fair account of the factual assertions at issue in this case, as taken from both parties' statements of fact and not genuinely disputed, unless stated otherwise.

In 1985, Defendant, a U.S. citizen, met Henri de Forrest ("Mr. de Forrest"), an affluent engineer, and the two became romantically involved. (Def.'s Answer ¶ 5, ECF No. 7); (FBAR Penalty Background, Ex. E to Mot., ECF No. 26-2). In the early 1990s, prior to her marriage to

[1] In addition, Defendant filed the Declaration of Brian McManus, (ECF No. 35), and several exhibits in support of her Response.

Mr. de Forrest, "Defendant learned that Mr. de Forrest had bank accounts outside the United States and owned several foreign companies." (Def.'s Answer ¶ 5).

In 1994, in Zurich, Switzerland, Mr. de Forrest granted "Sandra Joyce Conrow" (Defendant's name at that time) Power of Attorney over the account ending in 8669 by submitting a document to Swiss Bank Corporation that had been signed by both Defendant and Mr. de Forrest. (1994 Power of Att'y, Ex. 4 to Def. Dep., ECF No. 26-1). Defendant and Mr. de Forrest also signed an application for a VISA GOLD card in the name of Defendant, linked to the account at Swiss Bank Corporation (now known as UBS) ending in 8669. (Visa Appl., Ex. 4 to Def. Dep., ECF No. 26-1).

In December 1995, Defendant married Mr. de Forrest. (Def.'s Answer ¶ 11). According to Defendant, the couple had a good relationship, but after marriage Mr. de Forrest became controlling and abusive. (Def. Dep. 30:6–33:25, Ex. A to Pl.'s Mot. Summ. J. ("Mot."), ECF No. 26-1). At some point prior to 2000, Defendant hired CPA Thomas Brooks based on a referral from her estate lawyer, Douglas Rossi, to prepare income tax returns for herself and her husband. (Brooks Dep. 11:3–12:21, Ex. B to Mot., ECF No. 26-1). Brooks provided these services for each tax year from the time he was hired until Mr. de Forrest's passing, and continued to prepare the income tax returns of Defendant through the 2011 tax year. (*Id.* 104:3–105:9).

Brooks's normal course of action concerning the preparation of the de Forrests' joint tax returns was to collect documents from Defendant, fill out the income tax returns based on those documents, then sit down with Defendant and go over the tax returns with her. (*Id.* 14:19–15:13; 16:25–18:21). Defendant did not ask questions very often. (*Id.* 18:3–21); (Def. Dep. 39:8–16). Once Brooks obtained the necessary signatures, he would take the documents back to his office and mail them. (Def. Dep. 39:14–19); (Brooks Dep. 17:14–21). In completing this process, Brooks mostly consulted with Defendant and rarely spoke with Mr. de Forrest. (*Id.*

17:22–18:3; 25:10–13). This same pattern was used for the income tax returns prepared by Brooks from the time his engagement began through the 2005 income tax year. (*Id.* 14:19–15:13; 16:25–18:21; 25:10–13).

On May 30, 2001, in Zurich, Switzerland, Defendant and Mr. de Forrest signed a General Power of Attorney over the account ending in 8669, giving Defendant authority to take any actions with respect to that account. (Def. Dep. 12:8–13:7); (2001 Power of Att'y, Ex. 4 to Def. Dep., ECF No. 26-1). Further, Defendant opened an account in her name at UBS with an account number ending in number 5479 and signed a declaration requesting that all mail, statements, and correspondence related to the account be retained at the bank in Zurich and not sent to her home address. (Def. Dep. 17:12–19:1) (Def. Decl., Ex. 3 to Def. Dep., ECF No. 26-1). Defendant asserts that over the course of their relationship, Mr. de Forrest warned Defendant "not to say anything about anything" regarding the the Swiss accounts. (Def. Dep. 42:22–43:1).[2]

Toward the end of Mr. de Forrest's life, when it became more difficult to care for him, Defendant placed him in a convalescent facility. (*See* Def. Dep. 75:7–77:15). On June 8, 2006, Mr. de Forrest passed away. (Death Cert., Ex. 8 to McManus Decl.). Prior to the death of her husband, Defendant did not reveal the existence of the 8669 account or the 5479 account to Brooks or Rossi. (Brooks Dep. 19:18–20:4); (Rossi Dep. 15:21–17:18, Ex. C to Mot., ECF No. 26-1). At some point in fall 2006, after Mr. de Forrest's death, Defendant told Rossi that her husband had an account or accounts at UBS in Zurich. (Rossi Dep. 32:19–33:16). Defendant, Rossi, and Brooks then had a meeting at Rossi's office. (*See id.* 32:4–35:12). Defendant falsely represented to Brooks that she had only discovered the existence of the foreign accounts after

[2] In her Response, Defendant asserts that her husband threatened to murder her if she told anyone about the accounts. (Resp. at 2). However, there is no citation supporting this claim.

her husband's death while going through "some papers." (Brooks Dep. 32:9–33:20; 38:7–12); (Def. Dep. 41:12–42:19).

In order to take possession of the funds in the Swiss accounts, Rossi and Defendant contacted UBS in Zurich; however, UBS's agents were "not talking" about the accounts and informed Defendant that she would have to travel to Zurich in order to speak in person. (Rossi Dep. 35:7–24). Defendant asked Rossi to join her on the trip and he agreed to accompany her. (*Id.*). Prior to the trip, Rossi learned that a friend's brother by the name of Hansruedi Schumacher was an investment adviser in Zurich and had previously worked for UBS. (Rossi Dep. 43:7–45:7). Rossi arranged to have Schumacher assist during the UBS meeting. (*Id.*). Once in Zurich, Rossi, Defendant, and Schumacher went to UBS. (*Id.* 45:16–49:17). The meeting lasted about half an hour and they successfully arranged for the accounts to be transferred to UBS Santa Barbara. (*See id.*).

Sometime before leaving Zurich, Defendant opened an additional eight accounts at another Swiss bank, Zurcher Kantonalbank ("ZKB"), and signed documents directing that €2,500,000 be transferred into one of the accounts. (ZKB Account Docs., Ex. D to Mot., ECF No. 26-2). Further, Defendant signed a declaration requesting that all mail, statements, and correspondence related to the accounts be retained at the bank in Zurich and gave investment decision-making authority to Schumacher. (*Id.*). The parties dispute Defendant's motive for opening the eight ZKB accounts.

Defendant's 2005 income tax return was prepared by Brooks and was untimely submitted to the IRS in February 2007. (Brooks Dep. 80:21–81:81, 123:23–125:16). The 2005 tax return did not contain a Schedule B, where foreign account ownership and income is normally reported, even though by that time, Brooks knew of the UBS accounts. (*See id.*).

In August 2009, Brooks sent a letter to Defendant and enclosed completed FBAR forms for 2003, 2004, and 2005, with instructions to sign and mail them to the U.S. Department of

Treasury. (Brooks Dep. 88:4–92:12). Defendant did not sign or submit the FBAR forms for 2003, 2004, or 2005. (*Id.*).; (Def. Dep. 50:24–51:17). However, Defendant maintains she did not receive Brooks's letter or the enclosed FBARs. (*Id.* 51:8–52:19). To date, Defendant has not filed an FBAR for tax year 2005. (*See* Dep't Treasury Letter, Ex. E to Mot., ECF No. 26-2).

In 2011, the IRS initiated an examination of Defendant's tax and FBAR compliance. (Form 886A, Ex. 14 to Resp., ECF No. 35-15). In 2016, the IRS imposed an FBAR penalty equal to 50 percent of the account balance ending in 8669. (8669 Account, Ex. F to Mot., ECF No. 26-2); (Penalty Assessment, Ex. H to Mot., ECF No. 26-2) ($2,521,341.00 penalty). The IRS also imposed a penalty equal to 50 percent of the account balance ending in 5479. (5479 Account, Ex. G to Mot., ECF No. 26-2); (Penalty Assessment, Ex. H to Mot.) ($40,779.50 penalty).

On December 12, 2017, the Government filed its Complaint, (ECF No. 1), seeking a judgment for the FBAR penalties assessed against Defendant with regard to the 2005 and 2006 reporting periods, as well as associated penalties and interest, in the total amount of $2,982,291.81 (as of November 30, 2017), plus statutory accruals. On February 13, 2018, Defendant filed an Answer, (ECF No. 7), to the Government's Complaint and one counterclaim for illegal exaction. The Government's Motion for Partial Summary Judgment now follows.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* "Summary judgment is inappropriate if

reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

*Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50.

## III. DISCUSSION

The Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311, requires U.S. citizens to report to the Secretary of the Treasury any relationships they have with foreign financial accounts with balances in excess of $10,000. 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.306, 1010.350. Covered relationships include "having a financial interest in[ ] or signature authority over" a foreign bank account. 31 C.F.R. § 1010.350. For the years relevant to this action, the relationships must be disclosed on a Report of Foreign Bank and Financial Accounts ("FBAR") that must be filed no later than June 30 of the year following the calendar year during which the account was held. 31 C.F.R. § 1010.306(d); *United States v. Williams*, 489 Fed. App'x. 655 (4th Cir. 2012). Each failure to report each bank account for each year an FBAR is required is a separate violation of 31 U.S.C. § 5321. *See United States v. Boyd*, No. CV 18-803-MWF (JEMX), 2019 WL 1976472, at *5 (C.D. Cal. Apr. 23, 2019) appeal docketed, No. 19-55585 (9th Cir.); *United States v. Shinday*, No. 2:18-CV-06891-CAS-EX, 2018 WL 6330424, at *4 (C.D. Cal. Dec. 3, 2018).

The Internal Revenue Service (IRS) is authorized to assess FBAR penalties against individuals who violate the FBAR reporting requirements. *See* 31 U.S.C. §§ 5314, 5321. A penalty for a non-willful FBAR violation cannot exceed $10,000 per violation but a penalty for a willful FBAR violation can be the greater of $100,000 or 50 percent of the balance in the account at the time of the violation for each violation. 31 U.S.C. §§ 5321(a)(5)(B)-(D). A person is subject to the willful failure to file an FBAR penalty under § 5321(a)(5) if the following four elements are met: (1) the person is a United States citizen; (2) the person had an interest in or authority over a foreign financial account; (3) the financial account had a balance that exceeded $10,000 at some point during the reporting period; and (4) the person willfully failed to disclose the account and file an FBAR form for the account. *United States v. Toth*, 2017 WL 1703936, at *4 (D. Mass. May 2, 2017); *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012); *Bedrosian v. United States*, No. CV 15-5853, 2017 WL 1361535, at *3 (E.D. Pa. Apr. 13, 2017).

The Government bears the burden of proving each element of its claim for a civil FBAR penalty by a preponderance of the evidence, including the key question here of whether an individual's failure to report was "willful." *Williams*, 2010 WL 3473311, at *1; *McBride*, 908 F. Supp. 2d at 1201–02 (explaining that "[a]s with Government penalty enforcement and collection cases generally, absent a statute that prescribes the burden of proof, imposition of a higher burden of proof is warranted only where 'particularly important individual interests or rights,' are at stake") (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983)); *United States v. Bohanec*, 263 F. Supp. 3d. 881, 889 (C.D. Cal. 2016) (holding that because "[t]he monetary sanctions at issue [in an FBAR civil penalty action] do not rise to the level of

'particularly important individual interest or rights,' . . . the preponderance of the evidence standard applies").[3]

The Government moves for partial summary judgment asking that the Court find, as a matter of law, that Defendant's failure to file an FBAR for 2005 was willful.[4] Defendant counters that she had no duty to file an FBAR for 2005 and that even if she had a duty, Defendant did not possess the requisite willful state of mind to incur this heightened penalty. The Court now turns to the parties' respective arguments.

**A. Whether Defendant had an Interest in, or Authority Over, the UBS Accounts**

As an initial matter, Defendant argues that she was not obligated to file an FBAR for 2005 because she did not have the requisite financial or signature authority over the UBS accounts. (Resp. at 22, ECF No. 34). Defendant maintains that the accounts were her husband's. (*Id.*). She further contends that the regulations in place in 2006 did not provide guidance as to the terms "financial interest," "signature authority," or "other authority." (*Id.*). According to Defendant, her duty to file an FBAR was not triggered given the vague language of the statute, regulation, and FBAR forms. (*Id.*). However, Defendant fails to point to any vague language. And the bank documents Defendant signed in relation to the accounts leave little doubt as to Defendant's authority. Indeed, the account ending in 5479 was in her own name and she opened the account herself. The document conveying Power of Attorney to Defendant over the account ending in 8669 stated that Defendant is authorized to, *inter alia*, "dispose of all or any assets deposited at any time in my/our name with the Bank and to incur liabilities on my/our behalf." (1994 Power of Att'y, Ex. 4 to Def. Dep., ECF No. 26-1). Further, Defendant was empowered to "deposit, buy, sell, pledge, convert and withdraw in

---

[3] The Supreme Court has held that "particularly important individual interests or rights" warranting a heightened, clear and convincing burden of proof in civil matters are those such as parental rights, involuntary commitment, and deportation. *Herman & MacLean*, 459 U.S. at 389.

[4] The Government is not moving for summary judgment on the issue of whether Defendant willfully filed an incomplete FBAR for 2006.

my/our name, to lodge or withdraw funds in any manner whatsoever, . . . to sign settlements of account, receipts, discharges, transfers, and assignments . . . to receive communications, . . . to do everything, she/they/he may deem expedient or necessary." (*Id.*).

Defendant also disputes "that she had a financial interest in either of [Mr. de Forrest's] UBS accounts in 2005, that she was the beneficial owner of either account, that she was the record owner, or that the so-called powers of attorney that were produced by UBS as part of its records were legally effective in 2005." (Resp. at 22). Defendant provides no legal authority in support of these propositions. As such, Defendant fails to show a genuine dispute as to her interest in, and authority over, the UBS accounts.

**B. Whether Defendant's Failure to File an FBAR for 2005 was Willful**

Although the term "willful" is not defined in the code section, in civil cases, willfulness includes both knowing and reckless violations of a standard. *See* 31 U.S.C. § 5321; *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007). Reckless disregard of a statutory duty satisfies the willfulness standard. *McBride*, 908 F. Supp. 2d at 1204; *Bedrosian v. United States Dep't of Treasury, Internal Revenue Serv.*, No. CV 15-5853, 2017 WL 4946433, at *4 (E.D. Pa. Sept. 20, 2017). Recklessness is evaluated using an objective standard that evaluates whether an action entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Bedrosian*, 2017 WL 4946433, at *4 (quoting *Safeco Ins. Co.*, 551 U.S. at 68). The relevant inquiry is whether the failure to disclose the information was purposeful instead of inadvertent, not whether the taxpayer subjectively believed he was not required to file an FBAR. *See Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997); *McBride*, 908 F. Supp. 2d at 1210. Acting with "'willful blindness' to the obvious or known consequences of one's actions" also satisfies the willfulness standard. *Bedrosian*, 2017 WL 4946433, at *4 (quoting *McBride*, 908 F. Supp. 2d at 1205). Evidence of conduct intended to "conceal or mislead sources of income or other financial information" is evidence of willful blindness and

recklessness. *United States v. Williams*, 489 Fed. App'x. 655, 659–60 (4th Cir. 2012). However, "an improper motive or bad purpose is not necessary to establish willfulness in the civil context." *McBride*, 908 F. Supp. 2d at 1204 (internal citations omitted). Willfulness can be shown through circumstantial evidence and reasonable inferences drawn from the facts before the court. *Id.*[5]

Courts have reviewed de novo whether the account holder was willful. *See United States v. Williams*, 2010 WL 3473311, at *1 (E.D. Va. 2010), rev'd on other grounds, 489 Fed. App'x 655 (4th Cir. 2012); *McBride*, 908 F. Supp. 2d at 1201; *Bedrosian*, 2017 WL 4946433, at *2. However, when reviewing the penalty amount, courts have reviewed whether the penalty's size is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.§ 706(2)(A).

Here, the Government submits that "[a]s a matter of law, all taxpayers who sign and file a federal tax income return know or should know about the requirement to file an FBAR." (Mot. at 15). "[T]axpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS." *McBride*, 908 F. Supp. 2d at 1206. Courts have also held that "'individuals are charged with knowledge of the contents of documents they sign—that is, they have "constructive knowledge" of these documents.'" *Id.* (quoting *Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000)).

---

[5] Defendant argues that the proper willfulness standard is the criminal standard, which requires more than a showing of careless disregard for the truth and generally connotes a voluntary, intentional violation of a known legal duty. (Resp. at 23) (citing *Cheek v. United States*, 498 U.S. 192, 201 (1991) (criminal case involving willful filing of tax returns)). Defendant's argument is out of step with the weight of authority. *See, e.g.*, *Bedrosian v. United States Dep't of Treasury, Internal Revenue Serv.*, No. CV 15-5853, 2017 WL 4946433, at *3 (E.D. Pa. Sept. 20, 2017) (collecting cases and stating that "[e]very federal court to have considered the issue has found the correct standard to be the one used in other civil contexts— that is, a defendant has willfully violated Section 5314 when he either knowingly or recklessly fails to file an FBAR."). As such, Defendant's argument is unpersuasive.

The Government also explains that Schedule B, Part III, Line 7a, of a Form 1040 asks: "At any time during [a particular year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TDF 90-22.1." (Mot. at 16). Therefore, this simple yes-or-no question "makes it inconceivable that [a taxpayer] could have misinterpreted this question." (*Id.*) (quoting *McBride*, 908 F. Supp. 2d at 1208).

Because Defendant signed her 2005 tax return, which omitted foreign income and, through the omission of a Schedule B, claimed that she owned no interest in any foreign bank account, the Government argues Defendant was willfully blind in failing to file an FBAR for 2005. (Mot. at 21). Further, the Government points out that Defendant's contention that she did not read her tax returns does not make her innocent. (*Id.*). Rather, it reinforces that Defendant was willfully blind because she failed to pursue knowledge of reporting requirements related to her UBS accounts. (*Id.*).

The Government places great emphasis on Brooks's testimony that he sent Defendant a tax return preparation questionnaire each year, which included a question concerning foreign bank accounts, and that Defendant never filled it out. (Mot. at 19, 21). Defendant attempts to refute this by stating that neither Brooks nor the Government have produced a copy of the questionnaire. (Resp. at 13). But this does not create a genuine dispute of material fact. Notably, Defendant does not deny receiving the questionnaire. Nor does she claim to have requested it from the Government, the IRS, or Brooks. However, Defendant is correct that there is no evidence that Brooks ever expressly asked Plaintiff about foreign accounts, or that she affirmatively lied and said that no such accounts existed. (Brooks Dep. 21:4–7).

The Government further attests:

> it is undisputed that Defendant has not filed an FBAR for tax year 2005, or for any tax years prior to that. This is despite the fact that Mr. Brooks explained

> to Defendant what an FBAR was, informed her there were penalties if the form was not timely and accurately filed, and eventually prepared and mailed to her a completed 2005 FBAR. Defendant did not follow the instructions accompanying the FBAR that she should sign and file it. These facts establish that Defendant willfully failed to file an FBAR for 2005.

(Mot. at 20). However, genuine disputes of material fact do exist. First, while Brooks testified that after learning of the UBS accounts, Brooks informed Defendant that FBARs would need to be filed for all the open years and that there would be penalties otherwise, Defendant denies this took place. (Mot. at 16). Defendant argues that she took Brooks's advice with respect to filing amended income tax returns for the all the open years. (*Id.*). But Defendant insists it would not make sense to adhere to that piece of advice while rejecting Brooks's purported FBAR guidance. (*Id.*).

Additionally, there is no explanation as to Brooks's August 2009 letter to Defendant, which enclosed prepared FBAR forms for 2003, 2004, and 2005. Assuming Brooks advised Defendant about the importance of FBAR compliance in 2006, then his three-year delay in helping her comply with the filing requirement is inconsistent with his own advice. Further, as Defendant notes, the language in the August 2009 letter suggests that Brooks had only recently learned of the FBAR filing requirement: "The [IRS] recently indicated that funds with a situs of outside the U.S. would be subject to disclosure." (Aug. 26, 2009 Brooks Letter, Ex. 10 to Brooks Dep., ECF No. 26-1). Furthermore, evidence shows that in 2009, Defendant was either living in Las Vegas, Nevada, or splitting her time between her home in Las Vegas and her home in Santa Barbara. (Brooks Dep. 88:4–92:12); (Def. Dep. 51:7–52:19); (IRS Exam R., Ex. 7 to McManus Decl., ECF No. 35-8). Depending on the address Brooks sent the letter to, there is a chance that Defendant did not receive it. Indeed, Defendant testified that she had not seen the August 2009 letter before. (*Id.*).

The Court also notes that throughout Brooks's testimony, Brooks admitted inadvertently omitting information from Defendant's tax-related documents. For example, the 2004 amended

tax return checked "no" on the Schedule B foreign accounts and trusts question 7a. When asked about it, Brooks stated it was "[j]ust an oversight. We didn't get it corrected on the amended return. I mean, this is—this was before FBAR was even a big deal." (Brooks Dep. 79:4–12). Again, Brooks uses language suggesting he did not understand the FBAR filing requirements until years later.

Defendant's original 2005 return similarly checked "no" on the Schedule B foreign accounts and trusts question 7a. (*Id.* 81:1–83:11). It also failed include income from the UBS accounts. (*Id.*). When asked why this information was omitted despite his knowledge of the USB accounts, Brooks stated that he did not have knowledge of the accounts at that time. He was then reminded that the 2005 returns were submitted on February 26, 2007, months after he learned of the UBS accounts. At that point he indicated: "I have a foggy recollection that there was one year where [Defendant] called me and found a tax return in, like, a drawer. And I just said, 'Get it filed as soon as you can.'" (*Id.* 124:5–21). But this explanation is inconsistent with testimony regarding Brooks's tax preparation process. Specifically, Brooks testified that once he had Defendant and Mr. de Forrest's returns prepared, Defendant would either come to his office to sign them, or he would go to Defendant's home, go over the returns, obtain signatures, and "[he'd] bring them back [to his office] and mail them." (Brooks Dep. 17:14–21). If this was the same pattern he followed for the preparation of tax returns from the time his engagement began through the 2005 tax year, then the original 2005 returns would not have been in a drawer in Defendant's house. That is not to say that there is no reasonable explanation for this. But none has been provided.

Lastly, there is a genuine dispute as to the purpose of the eight Swiss bank accounts Defendant opened during her trip to Zurich in 2006. While the Government insists the accounts are further evidence of Defendant's reckless state of mind, Defendant asserts she signed the documents believing USB would repatriate the account funds. (Resp. at 18).

Moreover, Brooks's billing invoices indicate he was aware, in 2006, that the USB funds had been transferred to an intermediary bank. (*Id.*).

Because the Government's allegations as to Defendant's purported recklessness and willful blindness are grounded in genuinely disputed material facts, and all facts and inferences are viewed in the light most favorable to Defendant, the Government's Motion for Partial Summary Judgment is denied. *Eagle Produce Ltd. P'ship*, at 521 F.3d at 1207.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Government's Motion for Partial Summary Judgment, (ECF No. 26), is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall have 30 days from the date of this Order to submit a joint pretrial order.

**DATED** this 31 day of May, 2020.

Gloria M. Navarro, District Judge
United States District Court